CARAWAY, J.
| , In this child in need of care proceeding, three children were removed from the custody of the mother and stepfather following an incident of physical abuse. The children were adjudicated in need of care. At the dispositional hearing, the juvenile court continued custody of the three minor girls to their father and ordered the mother to pay child support to the father. Disagreeing with this result and the continued loss of custody of her daughters, the mother appealed. We affirm.

Facts and Procedural History

The children in this case, PJ, date of birth (DOB) 6/14/04, WJ, DOB 8/10/05, and HJ, DOB 6/27/06, were adjudicated in need of care. The case began in 2011 when Department of Child and Family Services (“DCFS”) received a complaint regarding a bruise on one of the minor children. Krystal Onellion (“Onellion”), a DCFS employee, investigated the complaint. On September 16, 2011, Onellion arrived at the mother’s residence. Due to the lack of cooperation by the mother of the children and the stepfather, Onellion left in order to obtain police assistance.
Later that day, Onellion returned with a police escort. Upon investigation, she observed a bruise under HJ’s eye. According to Onellion’s report, “the story was consistent with all three children who stated that they did get whipped this morning by the stepfather with an extension cord and HJ was hit in the eye with the extension cord this morning.” Onellion’s report also stated that PJ, one of the three children, “doesn’t know where the mark on HJ’s eye came from.” Nevertheless, PJ, |2WJ, and HJ admitted that both their mother and stepfather have whipped them with an extension cord. MC, the 12-year-old child of the mother, told Onellion that usually the children are whipped with belts but one time they were whipped with an extension cord. However, MC stated that HJ bruised her eye when she ran into a wall.
As a result of HJ’s bruise and the children’s statements, Onellion initially gave *519 the mother two choices — the mother could either leave with the children or have the stepfather leave the house while an investigation was conducted. While the stepfather appeared willing to leave, the mother refused to allow him to leave. As a result, Onellion removed the children from the ' home. While removing the children, the mother and stepfather acted in a threatening manner and attempted to prevent the removal of the children, to the point of damaging the police vehicle. Initially, five children were removed from the house, but KT, the daughter of the stepfather, and MC were picked up by other relatives.
After removing PJ, WJ and HJ from their home, DCFS immediately applied for and was granted an emergency Instanter Order. As a result, the children were placed in foster homes. On September 19, 2011, the court granted an Instanter Order giving temporary custody of the three minor children to DCFS. At the time, the children were to remain in foster care.
On September 21, 2011, the court held a hearing on the issue of continued custody. During this hearing, the CARA Center’s exam, conducted by Dr. Jennifer Rodriguez, was revealed. The results of HJ’s physical exam gave the juvenile court reasonable grounds to believe that the Ischildren were in need of care. While the investigating doctor, Dr. Rodriguez, did not note any bruise or abrasion on HJ’s eye, the exam did reveal that HJ had loop-shaped bruises on each of her legs. While PJ and WJ’s exams were not conducted in time for the hearing, they were examined the following day and their exams revealed no injuries. At this hearing, the juvenile court granted the father temporary custody of his three minor children. In addition, the court ordered home studies of the father, mother, and stepfather. The mother was permitted supervised visits with her children, and the court appointed Court Appointed Special Advocate (“CASA”) for the children. Finally, the court issued a protective order barring the use of corporal punishment upon the children and requested that DCFS develop a case plan.
On October 4, 2011, the children, including KT and MC, were interviewed by Jennifer Flippo, an employee of the Gingerbread House. KT was interviewed first and she stated that she had never seen the children being whipped. MC stated that HJ “ran into a wall while playing hide and seek.” Both of the statements by the older siblings were consistent with the ones they provided to DCFS on September 16, 2011.
The three younger children, PJ, WJ and HJ, recalled being whipped by their mother and stepfather. PJ testified that her mother and stepfather whipped them with an extension cord and a back scratcher. She stated her stepfather hit her on the back and rear, and that her mother hit her in the eye with the extension cord. She claimed that she was scared of her mother.
RHJ indicated that her stepfather hit her in the eye with the extension cord, leaving the mark, and not her mother. She could not explain why she was hit with the extension cord, but she noted that she did not like her stepfather. HJ also stated that she, referring to her mother, has hit her with a white extension cord and a gray and white stick.
WJ, the last child to be interviewed, stated that she was whipped with a white extension cord everywhere. In contrast to all of the other children and her prior statement, she said that KT had been whipped with the extension cord in the past. She stated that her mother has never hit her or her sisters in the face with an extension cord. While she relayed that she was scared of her mother and stepfather, she later indicated that she would *520 like to see her mother. During this taped interview, all three of the younger children recalled their own trauma of being hit with a white extension cord, and they all agreed that it left a mark.
On October 17, 2011, the mother and stepfather were arrested for negligent injury. The following day, the State filed their child in need of care (“CINC”) petition. Using Onellion’s report, the CARA Center exam results, and the Gingerbread house interviews, the State set forth facts and allegations of abuse warranting an adjudication of CINC, as set forth in La. Ch.C. art. 601, et seq.
On December 16, 2011, the court held an evidentiary hearing on this case in order to determine whether there were reasonable grounds to believe that the children were CINC. All of the attorneys stipulated to the | ¿introduction of the Gingerbread House tape into evidence and represented that they had previously reviewed it.
Concerning the testimony of the children at the hearing, all parties agreed upon the proper procedure for questioning the three younger children. The children were to be situated in a conference room, and everyone submitted their questions to Mr. Lillian, the children’s attorney, who conducted the entire interview with them. During this interview, HJ admitted that her mother had discussed the incident with her. For the first time, HJ mentioned bruises on her legs. First, she stated that the bruises were a result of her mother hitting her with either an extension cord or a belt, but she later conveyed that WJ caused the bruises when she hit her with a jump rope. WJ testified that HJ bruised her eye when she ran into a wall. PJ testified that HJ ran into a wall and received the bruise under her eye. As for the bruises on her legs, PJ stated that WJ hit HJ in the legs with the jump rope.
Dr. Rodriguez testified at the hearing. While she saw all three children, she testified that only HJ had any physical symptoms of potential abuse, including hair loss around her scalp and one loopmark on the upper part of each of her thighs. Dr. Rodriguez did not see any sign of a bruise under HJ’s eye. Nevertheless, she testified that the bruises on HJ’s legs were non-accidental injuries. When questioned by Dr. Rodriguez, HJ “shared that she had gotten whipped with an extension cord.” According to Dr. Rodriguez, the loopmarks “would be consistent with an extension cord 1 nor anything that’s folded over and it gets looped and you hit with it.” She did admit that a jump rope could be a “possible explanation” for the injuries.
Onellion testified consistently with her initial report regarding the visit on September 16, 2011. After her testimony, the State rested its case.
MC was the first person to testify on the mother’s behalf. While she initially stated that HJ hurt her eye by running into the wall, she admitted that she did not see her do it. MC testified that she saw WJ hit HJ with a jump rope in the legs, and that the younger children had been whipped with a belt.
KT testified that she does not remember a bruise under HJ’s eye. While she had seen her stepmother spank the children with her hand, she never saw her father strike any of the girls. Carissa Taylor, the children’s godmother, testified that she saw the eye injury. Although she stated that this was the first injury that she had ever seen on any of the children, she did not know how HJ bruised her eye. The stepfather chose not to testify due to his pending criminal case.
The children’s mother testified that she observed the eye injury on the Tuesday of the week that the girls were removed from her home. According to her, HJ ran into *521 a wall. As for the bruises on HJ’s legs, she testified that WJ hit HJ with a jump rope two times in the legs because she did not want to share with her little sister. The mother admitted whipping the children with a belt, but she denied ever hitting them with an extension cord or a stick. After being informed of the contents of the Gingerbread House tape, she stated that perhaps the children were lying because they had been 17punished prior to Onellion’s arrival. According to the mother, her three younger children were caught stealing and were in trouble when Onellion arrived. After providing this theft story for the first time at the hearing, the mother concluded her testimony by stating that she could not be entirely sure why her daughters were lying.
At the conclusion of the evidentiary hearing, the juvenile court determined that enough evidence was presented to believe that the children were abused. The juvenile court stated the following:
I reject the mother’s explanation. I do not find her believable or credible. That’s based on her demeanor as she answers the questions. It’s based on the explanation of her younger children which I watched carefully to observe their demeanor. And I believed them and I believed HJ’s consistent version and PJ and WJ’s versions given both to the Child Protective Services worker and to the Gingerbread interviewer as more credible and given more weight because it’s closer to the circumstances and free of — as much as possible — from undue influence.
After finding abuse, the juvenile court also stated its belief that the mother caused HJ’s eye and leg bruises. Finally, the date of January 20, 2012, was scheduled for the disposition of this matter.
DCFS submitted a predisposition report and summary of the father’s home study for the judge to review before the January 20, 2012 hearing. DCFS’s report stated that the mother and stepfather had not yet complied with the steps necessary to create a case plan for reunification. The letter recommended that the children remain in their father’s custody. Additionally, the home study revealed that the father had recently served a three-year jail sentence for the manufacture/distribution/possession of a Schedule I drug. Furthermore, the home study revealed that the father had | ^concerns that PJ and HJ were not his biological children. After initially stating that he might return any children that were not his, the father changed his mind and stated that he had been under a great deal of stress due to his new living situation. DCFS ended the home study report by stating that regardless of biology, the father did not wish to separate the three girls.
Sherry Carswell, the CASA advocate appointed to this case, also submitted a predisposition hearing report for the judge to consider. This report recommended that custody remain with DCFS for the time being and urged the father to make up his mind regarding whether he wanted custody of the three minor children. The report urged the mother and stepfather to cooperate and work on their case plan.
At the January 20, 2012 dispositional hearing, the juvenile court determined that the children were still in need of care. As a result, the court decided that the children were to remain in their father’s custody. In addition to being ordered to pay $405.50 per month in child support, the mother’s DCFS supervised visits were to continue. The stepfather was still not allowed to be present at these visits. Additionally, the juvenile court adopted a case plan with a goal toward reunification.
The mother, representing herself, filed a motion for appeal of the final judgment of *522 disposition which was signed on January 26, 2012.

Discussion

The mother’s first assignment of error questions the sufficiency of the evidence necessary to support the CINC disposition. In particular, she questions whether the burden of proof was met in this case and argues that 19the juvenile court should have used a standard of clear and convincing evidence in this case.
In order to adjudicate a CINC, the state has the burden of proving by a preponderance of the evidence one of the CINC grounds as set forth in La. Ch.C. art. 606. La. Ch.C. art. 665. The applicable grounds of La. Ch.C. art. 606 provide that:
A. Allegations that a child is in need of care must assert one or more of the following grounds:
(1) The child is the victim of abuse perpetrated, aided, or tolerated by the parent or caretaker, by a person who maintains an interpersonal dating or engagement relationship with the parent or caretaker, or by a person living in the same residence with the parent or caretaker as a spouse whether married or not, and his welfare is seriously endangered if he is left within the custody or control of that parent or caretaker.
⅜ * ⅜ ⅜ ⅜
(4) As a result of a criminal prosecution, the parent has been convicted of a crime against the child who is the subject of this proceeding, or against another child of the parent, and the parent is now unable to retain custody or control or the child’s welfare is otherwise endangered if left within the parent’s custody or control.
(5) The conduct of the parent, either as principal or accessory, constitutes a crime against the child or against any other child of that parent.
In order to meet the first ground of this statute and find a CINC, the court must make a determination of abuse. La. Ch.C. art. 603 provides the definition of abuse as follows:
(1) Abuse means any one of the following acts which seriously endanger the physical, mental, or emotional health and safety of the child:
(a) The infliction, attempted infliction, or, as a result of inadequate supervision, the allowance of the infliction or attempted infliction of physical or mental injury upon the child by a parent or any other person.
(b) The exploitation or overwork of a child by a parent or any other person.
(c) The involvement of the child in any sexual act with a parent or any other person, or the aiding or toleration by the parent or the | incaretaker of the child’s sexual involvement with any other person or of the child’s involvement in pornographic displays, or any other involvement of a child in sexual activity constituting a crime under the laws of this state.
The constitutionality of La. Ch.C. art. 665’s burden of proof in CINC cases has already been challenged. In State ex rel. J.K., the parents argued that the burden of proof should be clear and convincing evidence since the proceeding altered their parental rights. State ex rel. J.K, 33,878 (La.App.2d Cir.6/23/00), 764 So.2d 287, writ denied, 00-2637 (La.10/6/00), 771 So.2d 83. Since CINC proceedings do not permanently terminate parental rights and rulings are subject to further proceedings, the court held that La. Ch.C. art. 665’s burden of proof, preponderance of the evidence, was constitutional.
An appellate court cannot set aside a juvenile court’s findings of fact in the absence of manifest error or unless *523 those findings are clearly wrong. Allerton v. Broussard, 10-2071 (La.12/10/10), 50 So.3d 145; In re A.J.F., 00-0948 (La.6/30/00), 764 So.2d 47; State ex rel. J.B., 35,032 (La.App.2d Cir.5/9/01), 794 So.2d 899. Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the trial court. In re A.J.F., supra; Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). In order to reverse a fact finder’s determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and if such a basis does exist, (2) further determine that the Inrecord establishes that the fact finder is clearly wrong or manifestly erroneous. Allerton, supra; Stobart v. State, through DOTD, 617 So.2d 880 (La.1993); State ex rel. D.H., 04-2105 (La.App.lst Cir.2/11/05), 906 So.2d 554.
 In order to adjudicate the children in need of care, the State was required to prove by a preponderance of the evidence that the children were the victims of abuse perpetrated, aided, or tolerated by the mother or stepfather, and the children’s welfare is seriously endangered if the children remain with the mother and stepfather. La. Ch.C. art. 606. After receiving the evidence, the juvenile court provided thorough reasons for its judgment. Based upon the testimony and its observations of the parties, the juvenile court believed the children’s reports over the mother’s testimony. The juvenile court did not find that the mother was a credible witness. In a manifest error review, it is important that the appellate court not substitute its own opinion when it is the juvenile court that is in the unique position to see and hear the witnesses as they testify. In re A.J.F., supra; State ex rel. A.N., 46,597 (La.App.2d Cir.7/20/11), 70 So.3d 1041; State ex rel. L.M., 46,078 (La.App.2d Cir.1/26/11), 57 So.3d 518.
Additionally, there is sufficient evidence to support the juvenile court’s ruling that the children were in need of care. All three children stated that someone in their house, either their mother or stepfather, whipped them with an extension cord. Since the mother continues to reside with the stepfather, it was not necessary for the court to determine which adult caused the injuries. It is enough that they live together under this 112cloud of abuse against the children. The mother and stepfather had exclusive control and care of the children when the abuse occurred. State ex rel. W.H.V. v. J.A.V., 35,887 (La.App.2d Cir.2/27/02), 811 So.2d 189. However, the trial court held that the mother caused HJ’s eye and thigh injuries. As a result of such finding, the trial court held that the State proved by a preponderance of the evidence that the mother abused the children, resulting in a finding that the children were in need of care.
The children’s testimony of the incident is supported by the bruises on HJ’s legs and Onellion’s report of the bruise under HJ’s eye. While the children’s testimony at the trial changed from their earlier accounts, HJ, the youngest child, admitted to discussing the case with her mother. This admission supports the juvenile court’s decision to rely primarily on the nearly contemporaneous statements to Onellion on the day of the children’s removal from the house and those recorded statements at the Gingerbread house. Furthermore, the children’s testimony at the hearing occurred over four months after the events in this case. The juvenile court felt that the statements to Onellion *524 and those made at the Gingerbread house were more contemporaneous and free from prejudicial influence.
Given the deference afforded to juvenile court decisions, and the ongoing juvenile court review of CINC adjudications, we believe that the State proved by a preponderance of the evidence that the children are in need of care. The juvenile court observed from the Gingerbread House tape that was admitted into evidence that PJ,- HJ and WJ all alleged that their mother and stepfather had abused them typically with an extension cord, [^causing them pain and suffering. Under the manifest error standard, the juvenile court’s determination that there was abuse and its adjudication of the children as in need of care have not been shown to be clearly in error.
Secondly, the mother argues that the Gingerbread House tape is inadmissible under La. Ch.C. aft. 327(A). La. Ch.C. art. 327 provides that:
A. A prehearing videotape which meets all the requirements of Article 326[1] may be admissible into evidence if all of the following occur:
(1) The parties to the proceeding are afforded an opportunity to view the recording before it is offered into evidence.
(2) The person conducting or supervising the interview of the protected person in the recording is present at the proceeding and available to testify- of be cross-examined by either party.
(3) The protected person is available to testify.
At the dispositional hearing, the mother was represented by counsel. As a result, he spoke on her behalf and was in charge of protecting her interests. Not only did he stipulate to the introduction of the videotape, a fact that bars her from challenging it on appeal, but he acknowledged having viewed the recording. Furthermore, the tape was available in the judge’s chambers during the hearing thus making it available for others to view. Regarding the second and third requirements, the employee from the Gingerbread house was available in the courtroom to testify and the children did testify. Thus, the Gingerbread House tape was properly admitted into evidence as all of La. Ch.C. art. 327(A)’s requirements were met.

Conclusion

For the foregoing reasons, we find that the State proved by a preponderance of the evidence that the children, PJ, WJ and HJ, are in need |uof care. Accordingly, we hold that the removal of the children from their mother and stepfather’s house and placement of PJ, WJ and HJ with their father was warranted in this case. As a result, we affirm the juvenile court’s ruling. Costs of appeal are assessed to the mother.
AFFIRMED.

. La. Ch.C. art. 326 deals with the certification procedures that must be met in making the videotape. The mother does not contest these procedures.