# STATE OF LOUISIANA

## COURT OF APPEAL

## FIRST CIRCUIT

## 2019 CJ 0248

### STATE OF LOUISIANA IN THE INTEREST OF: A.S. W/F DOB: 07/28/2007

**Judgment Rendered:** SEP 0 4 2019

\* \* \* \* \* \*

On Appeal from the City Court of Denham Springs, Ward II
In and for the Parish of Livingston
State of Louisiana
Docket No. 11671-1

Honorable Jerry L. Denton, Jr., Judge Presiding

\* \* \* \* \* \*

| | |
|---|---|
| Laura G. Slocum<br>Sherry Powell<br>Laura Locker-Melancon<br>Baton Rouge, Louisiana | Counsel for Plaintiff/Appellee<br>Department of Children & Family<br>Services |
| Brad Cascio<br>Assistant District Attorney<br>Livingston, Louisiana | Counsel for Plaintiff/Appellee<br>State of Louisiana |
| Alice Montestruc<br>MHAS/Child Advocacy Program<br>Baton Rouge, Louisiana | Counsel for Plaintiff/Appellee<br>On behalf of the minor child, A.S. |
| DeVonna Ponthieu<br>Watson, Louisiana | Counsel for Defendant/Appellant<br>C.S. – Father |

\* \* \* \* \* \*

**BEFORE: WHIPPLE, C.J., McCLENDON, AND HIGGINBOTHAM, JJ.**

Higginbotham, J. concurs

**McCLENDON, J.**

In this appeal, the biological father of minor child A.S. appeals the trial court judgment adjudicating A.S. as a Child in Need of Care as to the father. For the reasons that follow, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

This case arose from Child in Need of Care ("CINC") proceedings. The allegations providing the basis for the CINC proceedings involved mistreatment that was primarily directed at minor child C.S., and occurred in the presence of his sister, minor child A.S., causing harm to A.S. as a result of bearing witness to the abuse of her brother. C.S. passed away before adjudication and disposition of the CINC proceedings, though his death was not related to the allegations underlying the CINC proceedings. Of note, C.S. was a special needs child diagnosed with Asperger's Syndrome and ADHD, and was suffering from large cell lymphoma, non-Hodgkin's, during the relevant timeframe.

Prior to the institution of the CINC proceedings underlying the instant appeal, A.S. and C.S. were adjudicated Children in Need of Care as to their father on September 10, 2015 by the City Court of Denham Springs, Ward II ("2015 CINC proceedings"). Disposition on December 10, 2015, placed the children in the sole custody of their mother, S.P., with only supervised visits with their father, whose initials are also C.S. The City Court of Denham Springs, Ward II relinquished jurisdiction upon disposition.

Following disposition, the mother and the father signed a stipulated consent judgment requesting shared "50/50" custody of A.S. and C.S. This judgment was submitted to and signed by the Family Court in and for the Parish of East Baton Rouge.

On March 16, 2018, an oral instanter was issued, again removing A.S. and C.S. from the custody of their father and his wife P.S. and placing A.S. and C.S. in the temporary custody of their mother, S.P. ("2018 CINC proceedings").

On March 21, 2018, the City Court of Denham Springs, Ward II ("trial court") held a hearing in the 2018 CINC proceedings. The father was present; however, the mother, A.S., and C.S. were not present; C.S. was in the hospital due to complications

from cancer, and passed away later that day. A subsequent hearing was set for May 10, 2018.

On April 20, 2018, a petition was filed in the trial court seeking adjudication of A.S. and C.S. as Children in Need of Care. The petition contained allegations of ill treatment of A.S. and C.S. by their father and his wife, P.S.

On May 10, 2018, after the trial court received sworn testimony that minor child C.S. had passed away, counsel for the father requested an amended petition removing the name of minor child C.S. from the CINC petition. The trial court granted this request and set a subsequent hearing date. The amended CINC petition was filed on May 30, 2018.

The adjudication hearing which is the subject of this appeal took place on September 26, 2018. Appearances were made by counsel for the State, counsel for A.S. provided through Mental Health Advocacy Service/Child Advocacy Program ("counsel on behalf of A.S."), and defense counsel for the father. A.S. was adjudicated a Child in Need of Care as to her father, pursuant to Louisiana Children's Code Article 606(A) subsections 2 and 5, for neglect and crime against a child.

At the conclusion of the adjudication hearing, the father consented to a disposition hearing. (R. 127) The trial court ordered the following disposition: that A.S. remain in the custody of her mother, S.P.; that the father may not have any contact with A.S. until further orders from the trial court; that A.S. shall continue receiving therapy; that the trial court shall maintain jurisdiction until A.S. reaches the age of majority; that a case plan be developed for the father; and, that the father and his wife submit to a psychological evaluation as part of the father's case plan. (R. 51-55.)

From this adjudication and disposition, the father appeals. The assignments of error are essentially:

1. The trial court erred in adjudicating A.S. as a Child in Need of Care as to her father.
2. The trial court erred in allowing testimony that constituted inadmissible hearsay over the objection of counsel for the father.
3. The trial court erred in permitting a non-expert to testify as to the causation of A.S.'s behavior.

3

4. The trial court erred in permitting testimony regarding the 2015 CINC proceedings.[1]

## LAW, ARGUMENT & ANALYSIS

This Court has jurisdiction over these proceedings subject to Louisiana Children's Code Article 330. Louisiana Children's Code Article 330 provides that in Child in Need of Care proceedings, an appeal may be taken only after a judgment of disposition, and the appeal shall include all errors assigned concerning the adjudication and disposition.

CINC proceedings are governed by Louisiana Children's Code Articles 601–725.6. The purpose of the proceedings is to protect children whose physical or mental health and welfare is substantially at risk of harm by physical abuse, neglect, or exploitation and who may be further threatened by the conduct of others. The health, safety, and best interest of the child shall be the paramount concern in all CINC proceedings. See LSA Ch. C. art. 601.

Louisiana Children's Code Article 606(A) mandates that allegations that a child is in need of care assert one or more of certain enumerated grounds. Pertinent to this appeal, the grounds for finding a child to be in need of care include that the child is a victim of neglect, and that the conduct of a parent constitutes a crime against the child or against any other child. LSA Ch. C. art. 606(A)(2) and (5). Louisiana Children's Code Article 603(18) defines neglect as the refusal or unreasonable failure of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child's physical, mental, or emotional health and safety is substantially threatened or impaired. Louisiana Children's Code Article 603(12) provides that a "crime against the child" "shall include the commission of or the attempted commission" of crimes against the child, including criminal neglect. Louisiana Revised Statute § 14:93(A)(1) defines the crime of cruelty to juveniles as the intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child.

---

[1] For the detailed reasons to follow, we find no merit as to assignment of errors 2-4. See **Lee v. Louisiana Bd. of Trustees for State Colleges**, 2017-1433 p. 4 (La. App. 1 Cir. 3/13/19), ___ So. 3d ___, ___.

4

## ADJUDICATION HEARING

The September 26, 2018 adjudication hearing began with a viewing of the recording of a Children's Advocacy Center ("CAC") interview of A.S. conducted on June 5, 2018, after all counsel confirmed for the record that they had stipulated to the admission of the CAC recording. The recording was paused as counsel for the father objected "to any comment [A.S.] makes about [C.S.] in regards to this petition. He is not part of it so I want to strike anything that is said about [C.S.]." In response, counsel for the State argued "[C.S.]'s name is mentioned all throughout the petition because it's alleged that the majority of the alleged physical abuse was against [C.S.] and resulted in the emotional and mental abuse [of A.S.] due to the fact that this juvenile had to watch the abuse on the other child." The trial court found that testimony regarding C.S. "impact[ed] the case directly" and allowed the testimony.

A.S. was the first witness to testify. A.S. testified regarding events she witnessed, and events C.S. recounted to her. The testimony elicited from A.S. by the State and by counsel on behalf of A.S. clearly distinguished between those events A.S. had witnessed first-hand and those she had not. Counsel for the father objected to the testimony regarding events A.S. did not witness first-hand.

A.S. testified that she had seen C.S. "locked in his room," that she had seen that "[t]he lock was on the outside [of C.S.'s bedroom door]," and that this confinement lasted "[a]ll night". A.S. testified that C.S. had told her that their father chained him to the bed when he was locked in his room, but that she had not seen him handcuffed. A.S.'s testimony continued:

Q.  If [C.S] had to go to the bathroom, was he allowed to get out and go to the bathroom?

A.  At night time, no.

Q.  So what would happen if [C.S.] had to go to the bathroom?

A.  He still had to stay in his room.

Q.  Ok. And so...you got to go you got to go...Did he ever have an accident or anything?

A.  Yes he had accidents a lot.

5

Q.  Because he wasn't allowed to go to the bathroom?

A.  Yes and he was only allowed to go at certain times of the day too.

Q.  What times of the day was he allowed to go to the bathroom?

A.  Certain amounts of time during the day. He had to ask to go.

Q.  Ok, he couldn't just go to the bathroom.

A.  He had to tell them when he was done too.

Q.  Ok, he had to tell them when he was done using the bathroom. Did your father make you do that too?

A.  No ma'am.

Q.  Did he make [your stepsister] do that?

A.  No ma'am.

Q.  Did he make [your other stepsister] do that?

A.  No ma'am.

Q.  Do you think that you and your brother were treated differently from your step-sisters?

A.  Yes ma'am.

Q.  Do you think [C.S.] was treated worse than you were treated?

A.  Yes ma'am.

When questioned whether the accidents were something A.S. saw or C.S. told her about, A.S. explicitly stated that she had seen C.S.'s accidents.

A.S. testified that she had seen "[her father and P.S.] [yell] at [C.S.] and put him outside until Mommy got to the house to get him," and that she had seen C.S. being kept outside when she got home from school. A.S. stated that on these occasions, the door was locked and her father and P.S. told A.S. not to let C.S. inside.

A.S. testified regarding another instance where her father told C.S. to put the trash out and C.S. did not put it in the right place so "Daddy put him back outside in the garage and turned the lights off. [He told] [C.S.] to fix it and [C.S.] was afraid of the dark." The trial transcript reflects that A.S. became upset during this line of questioning.

6

As to how the children were treated, A.S. also testified that she went to Six Flags and the park with her father, but C.S. did not get to go, and that C.S. "did most of the chores."

A.S. stated that she was timed when she played videogames, but that her stepsister was not; and that her stepsister was allowed to have friends over, but A.S. was not.

She also indicated that C.S. was sometimes not permitted to sit at the same table to eat as the rest of the family. When asked if that was all of the time, A.S. replied "[t]hat was when he got cancer." When asked if it was before the cancer too, A.S. replied "[n]o ma'am." A.S. went on to testify that her father failed to make sure C.S. was fed when he was hungry.

A.S. said that she has trouble sleeping because she has nightmares that her father hurts her mother. A.S. also testified that given the choice, she would stay with her mother forever because her mother was nicer and took "care of me way better." A.S. told the trial court that she did not want see her father anymore "[b]ecause he's scary… [b]ecause of the stuff he did to [C.S.]." The trial transcript reflects that A.S. was crying during this portion of the testimony.

Jenny Petty, a school counselor who had seen A.S. from 2015 until May 2018 when A.S. went to middle school, also testified. Ms. Petty is a nationally certified school counselor and a licensed professional counselor. Ms. Petty testified that she had observed A.S. had emotional issues prior to C.S.'s death, and that when A.S. began residing solely with her mother she was happier, "seemed relieved as if she had a weight lifted off her shoulder[s]," and "seemed like more of an upbeat child." Ms. Petty testified that A.S. had expressed she did not want to see her father anymore. Though the father's third assignment of error argues that counsel for the father objected to Ms. Petty's testimony as to "what the reason was for the minor child being compliant" because she had not been qualified as an expert, the record before this Court does not reflect this testimony was ever presented to the trial court.

Mindy Daniels, a therapist who had seen A.S. a number of times, testified that when she asked A.S. about her father, A.S. would get very quiet and say she did not

7

want to talk to about it. However, A.S. did not disclose anything regarding her father to Ms. Daniels.

Testimony was taken from Pamela Patterson, a Supervisor with the Livingston Parish Department of Children and Family Services ["DCFS"]. Ms. Patterson summarized the events of the 2015 CINC proceedings, and testified that the allegations of the 2015 CINC proceedings were similar to those in the 2018 proceedings. Ms. Patterson also testified that DCFS "has validated the emotional maltreatment" in the instant matter, and that the recommendation of DCFS is that A.S. remain in the custody of her mother and not have any contact with her father, per A.S.'s wishes and "to prevent further emotional maltreatment of the child." Counsel for the father objected to Ms. Patterson testifying regarding the 2015 CINC proceedings.

A.S.'s mother testified that when she consented to shared custody following the 2015 adjudication, she could not afford counsel and was under the impression the father could take the children from her if she did not agree to shared custody. A.S.'s mother also testified that the father did not allow A.S. and C.S. to visit her as set forth in the consent judgment, and that the father prevented C.S. from visiting as frequently as A.S. as a form of punishment.

A.S.'s mother testified that at the time she consented to shared custody, A.S. and C.S. "weren't afraid of [their father] and they did want to spend time with him." She went on to testify that A.S. now wants nothing to do with her father and does not want to go near him. A.S.'s mother verified that A.S. has trouble sleeping because of nightmares about her father, school, and C.S. She stated that A.S. had not been back to see Ms. Daniels because A.S. was now seeing a new counselor which whom she was more comfortable, and that A.S.'s psychiatrist was hoping to avoid medicating A.S. by trying "all the routes first before we push medication on her."

A.S.'s father testified that he had taken C.S. to all of his doctor's appointments and stayed in the hospital with him. He also stated that he had cards and drawings from A.S. stating that she loved him and P.S.

With respect to the allegations regarding his treatment of A.S. and C.S., the father admitted to making A.S. "stand like a tree" as punishment during the 2015

8

investigation, but stated that he did not know that was wrong at the time and had ceased doing it upon learning so. When questioned regarding the allegation in the petition that A.S. was not permitted to cry, the father explained "if A.S. would start to cry when having [a] conversation, we would tell her to go and calm down."

A.S.'s father expressly denied all other allegations of poor treatment of A.S. and C.S. Specifically, the father denied that C.S. was ever forced to eat at a separate table; denied that C.S. was denied food; and denied that C.S. was locked in his room or that handcuffs were used on either child. A.S.'s father testified that the reason he had possession of the handcuffs was that they had belonged to A.S.'s mother explaining that "she was into handcuffs" and he did not know that he still had them when the police found them in his home during the 2015 investigation. When questioned as to how the police knew exactly where to look in his home for the handcuffs, he said it was because C.S. would "go through the house and on quite a few occasions I had found him in my closet in my bedroom, when [neither P.S. nor I were] in there."

The father testified that he did not treat the children differently, that C.S. had gone to Six Flags and the park, and that C.S. had also gone with the family on other outings such as to the aquarium. He denied keeping C.S. from visiting his mother as a punishment and denied putting C.S. in the garage in the dark as a punishment. R. 97. He testified that the only reason C.S. was ever kept away from his mother was when his autoimmune level was low from chemotherapy. The only reason the father could think of that A.S. would not want to go to his home was because she was scared of her mother.

P.S. also testified. R. 103. During her testimony, P.S. denied treating her daughters better than A.S. and C.S.; denied locking C.S. in his bedroom; denied putting handcuffs on C.S.; denied telling C.S. he could not use the bathroom; denied locking C.S. outside; denied locking C.S. in the garage in the dar; and denied preventing C.S. from seeing his mother. P.S. also stated that A.S. and C.S. participated in family activities such as trips to the zoo, the aquarium, and the park.

P.S. testified that she had a good relationship with A.S. and C.S. and considered them her children, not her stepchildren. P.S. spoke about the same cards and drawings

9

from A.S. that her husband had discussed. When the State inquired whether the cards and drawings were dated, P.S. stated that they were not.

P.S. admitted that A.S. and C.S. had not been to Six Flags because they were with their mother during those trips. When counsel for A.S. asked specifically whether C.S. had been left out of a trip to Six Flags, P.S. acknowledged that he had been left out, but stated that it was because he had not been listening to the father and P.S. and that the punishment was given with the mother's approval.

When the State asked why A.S. and C.S. would make these allegations, P.S. responded "[b]ecause C.S. had Asperger's and he had a habit of making up stories." When counsel for A.S. asked P.S. if she knew why A.S. was fearful of P.S. and A.S.'s father, P.S. said no. P.S. further stated that she is at home all the time and she and A.S. talk and A.S. tells P.S. she loves her.

Mercedes Moreland, P.S.'s adult daughter who lived with her partner at the home of the father and P.S., denied ever seeing her stepfather or P.S. mistreat A.S. and C.S. She testified that she had no knowledge of C.S. being handcuffed to his bed, denied food, denied bathroom usage, or being locked in his room or the garage or outside. Ms. Moreland also testified that she was home often enough to know whether the alleged events took place; however, on cross examination, Ms. Moreland testified that she worked three twelve-hour days a week, went to school for half a day twice a week, worked some twelve-hour shifts on the weekend, and was home for every meal and for every bedtime. She specifically denied ever going to eat with her friends or boyfriend.

Christian Kesler, Ms. Moreland's partner; Dale Moreland, the ex-husband of P.S. and the father of Ms. Moreland; and Natalie Istre, a "pseudo grandparent" on the father's side, testified on behalf of the father. They denied any knowledge that A.S.'s father ever mistreated her or C.S., but also conceded that they were not with the family at all times.

At the conclusion of testimony, the State requested that the trial court adjudicate A.S. a Child in Need of Care under Louisiana Children's Code Article 606. The State argued that although the last several witnesses denied seeing the father or P.S. neglect or mistreat A.S., they were not in the home at all times, and child abuse and child

10

neglect typically do not occur in front of people. Counsel for A.S. joined the State's request to adjudicate A.S. as a Child in Need of Care. Counterarguments made on behalf of the father included that the trial court should not rely on testimony regarding what C.S. recounted to A.S. because it was inadmissible hearsay, and that A.S. was not alleging "abuse to herself." Additional counterarguments were that the father and P.S. had testified consistently, and that "everything [A.S.] said was hearsay except for a few things she said she did not know."

The trial court adjudicated A.S. a Child in Need of Care under Louisiana Children's Code, specifically under Article 606(A)(2), neglect, and 606(A)(5), crime against the child. (R. 126) The trial court further stated:

> Well having listened to the testimony of all of the witnesses, case workers, guidance counselor, all that while significantly moving me in one direction or another, have not impacted me as much as what I was told and what was expressed to me [A.S.] herself [sic] and that impacted more and I find the weight of her fear and her concerns outweighs any constitutional rights that Ms. Ponthieu [sic] client may have today, based upon the fact that she appears to be in legitimate fear for whatever reason. I'm not going to put a child that fearful back into a home where she is having nightmares and requiring psychiatric treatment... I think it is in the best interest of the child are served [sic] by not forcing her to go back to a place where she expresses extreme fear to me...

### ASSIGNMENTS OF ERROR

In this appeal, the first assignment of error asserted by the father is that the State did not prove a factual basis for finding that A.S. was a Child in Need of Care as to the father.

Louisiana Children's Code Article 606 requires that allegations that a child is in need of care assert one or more of certain enumerated grounds. The allegations that A.S. was a Child in Need of Care as to her father asserted the ground of neglect, as provided in Louisiana Children's Code Article 606(A)(2), and the ground that the conduct of the parent, either as principal or accessory, constitutes a crime against the child or against any other child, as contained in Louisiana Children's Code Article 606(A)(5). In order to adjudicate A.S. a Child in Need of Care, the State's burden was to prove one or more of the enumerated grounds by a preponderance of the evidence. See **State in Interest of P.J.**, 47,550 (La.App. 2 Cir. 9/12/12), 104 So.3d 517, 523.

11

As phrased by counsel for A.S. at the adjudication hearing, the basis for adjudicating A.S. as a Child in Need of Care was "the emotional abuse that she sustained as a result of having a front seat to the abuse of [C.S.]." A.S. testified that she saw her brother, a child with special needs and cancer: locked in a dark garage for punishment when he was scared of the dark; locked in his room overnight; forced to ask for permission to use the restroom and forced to notify his father when he was done; denied the usage of the restroom overnight and in general; denied food; denied a seat at the family table; denied the same privileges as the other children in the home; and burdened with the majority of the housework. Ms. Patterson testified that DCFS validated the emotional maltreatment of A.S. by her father, and that DCFS recommended that A.S. remain with her mother and have no contact with her father to prevent further emotional maltreatment of A.S. Jenny Petty testified that A.S. seemed happier since living solely with her mother and that A.S. had expressed to her that she did not want to see her father anymore. Mindy Daniels testified that A.S. was reluctant to discuss her father, though she did not disclose specifics to Ms. Daniels. Finally, A.S.'s mother testified that A.S. has trouble sleeping due to nightmares about her father and C.S., and that A.S. wanted nothing to do with her father.

In cases involving the custody of children, the trial court is vested with a vast amount of discretion. **State ex rel. AR**, 99-0813 (La.App. 1 Cir. 9/24/99), 754 So.2d 1073, 1077. The trial court is in a better position to evaluate the best interest of a child because of its superior opportunity to observe the parties and the witnesses who testified at the trial. It is well settled that an appellate court cannot set aside a juvenile court's findings of fact in the absence of manifest error or in the clearest case of abuse of the trial court's great discretion. See **State in Interest of P.D.J.**, 200 So.3d at 924; **State ex rel. AR**, 754 So.2d at 1078; see also **State in Interest of C.K.**, 2016-0305, (La.App. 1 Cir. 9/1/16), 2017 WL4586039 (unpublished). The two-part manifest error test considers: 1) whether there is a reasonable factual basis in the record for the finding of the trial court; and 2) whether the record further establishes that the finding is not manifestly erroneous. **Mart v. Hill**, 505 So.2d 1120, 1127 (La. 1987). If a reasonable factual basis exists, an appellate court may set aside a trial court's factual

12

finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. **Lewis v. Fowler**, 2018-0365 (La.App. 1 Cir. 9/24/18), 259 So.3d 364, 367. Moreover, where factual findings are based on determinations regarding the credibility of witnesses, the trier of fact's findings demand great deference and are virtually never manifestly erroneous or clearly wrong. *Id.* Even though an appellate court may feel that its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. **Lewis**, citing **Rosell v. ESCO**, 549 So.2d 840, 844 (La. 1989).

The testimony given by A.S. and on her behalf clearly provides a reasonable factual basis to support the trial court's finding that A.S. is a Child in Need of Care as to her father. A.S.'s testimony is independently sufficient to support a finding that A.S. is a Child in Need of Care as to her father on the grounds of both neglect and crime against the child. A.S. testified that she witnessed her father's failure to provide C.S. with proper food, care, and treatment, causing C.S. unjustifiable pain and suffering. In exposing A.S. to this mistreatment of her brother, the father failed to provide proper care to A.S., threatening her mental and emotional health and causing A.S. unjustifiable pain and suffering.

Because a reasonable factual basis exists in the record supporting the trial court's finding, this Court may only set aside the trial court's finding if it determines the trial court's finding was clearly wrong after reviewing the record in its entirety. **Lewis**, 259 So.3d at 367. The trial court made its finding after reviewing the CAC interview and hearing the testimony of eleven witnesses, and based upon the testimony and its observations of the parties, the trial court believed A.S. and the witnesses who corroborated her testimony over the father's testimony and those witnesses who corroborated the father's testimony. The trial court explicitly stated that it found the most convincing and moving testimony to be that of A.S. herself. Where factual findings are based on determinations regarding the credibility of witnesses, the trier of fact's findings demand great deference and are virtually never manifestly erroneous or clearly wrong. *Id.* Given the record before us, the trial court's finding that A.S. is a Child in

13

Need of Care as to her father on the basis of neglect and crime against the child was not manifestly erroneous.

We note the father's argument that because the trial court stated that it was not "convinced that [the father's] cruelty was intentional," A.S. should not have been adjudicated a Child in Need of Care.[2] However, Louisiana Children's Code Article 603(18) defines neglect as the refusal or unreasonable failure of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child's physical, mental, or emotional health and safety is substantially threatened or impaired. Louisiana Children's Code Article 603(12) provides that "crime against the child" "shall include the commission of or the attempted commission" of crimes against the child, including criminal neglect. Louisiana Revised Statute § 14:93(A)(1) defines the crime of cruelty to juveniles as the intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. Intent is not a required element of neglect or of crime against the child. Therefore, we reject this argument, and find no merit in this assignment of error.

In the father's second, third, and fourth assignments of error, we are asked to review evidentiary rulings of the trial court. Initially, we note that the trial court has great discretion when considering evidentiary matters, and an appellate court may not reverse the trial court in the absence of a clear abuse of this great discretion. See **Heller v. Nobel Insurance Group**, 2000-0261 (La. 2/2/00), 753 So.2d 841, 841. In reaching a decision on these alleged procedural errors, this Court must consider

---

[2] Appellee MHAS maintains that the father's appeal professes to appeal the ruling of the trial court relative to the adjudication hearing, and therefore the portion of the transcript relative to the disposition hearing is irrelevant. In the same vein, the State argues that the award of sole custody to mother is not before this Court because sole custody was awarded in the Order of Removal and was affirmed at disposition.

The trial court heard and ruled on the adjudication and disposition the same day, and addressed them in the same judgment. Louisiana Children's Code Article 330 states than an appeal may not be taken until after disposition and shall include the adjudication and the disposition, and this Court has previously refused to consider an appeal of a Child in Need of Care case prior to a judgment of disposition. See **State ex rel. C.J.**, 2006-1441 (La.App. 1 Cir. 2/14/07), 959 So.2d 972, 975, writ denied, 2007-0579 (La. 4/5/07), 954 So.2d 147; see also **State in Interest of A.F.**, 2016-0711 (La.App. 4 Cir. 1/25/17), 211 So.3d 673, 676. Because the father could not have brought this appeal in the absence of disposition, this Court's review of this appeal has been based on the entirety of the record before it.

14

whether the particular ruling complained of was erroneous and whether the error prejudiced the defendant's cause, for unless it does, reversal is not warranted. See Louisiana Code of Evidence Article 103; **Brumfield v. Guilmino**, 633 So.2d 903, 911 (La.App. 1 Cir. 1994), writ denied, 637 So.2d 1056 (La. 1994). Moreover, the party alleging error has the burden of showing the error was prejudicial to its case. The determination is whether the error, when compared to the record in its totality, has a substantial effect on the outcome of the case. *Id.* Absent a prejudicial error of law, this Court is not required to review the appellate record *de novo*. See **Rosell**, 549 So.2d at 844 n. 2.

The father's second assignment of error is that the trial court erred in allowing testimony that constituted inadmissible hearsay over the objection of counsel for the father. Hearsay evidence is generally described as testimony in court, or written evidence, of a statement made out of court, the statement being offered to show the truth of the matters asserted therein and thus resting for its value upon the credibility of the out-of-court asserter. **State v. Hayes**, 414 So.2d 717, 721 (La. 1982). Such evidence is generally inadmissible as being unreliable because it is based on statements made by persons who are not before the court, have not been sworn and are not available for cross-examination. **Kikendall v. American Progressive Ins. Co.**, 457 So.2d 53, 56 (La.App. 1 Cir. 1984). There are well-recognized exceptions to the hearsay rule. Declarations by a deceased person which are admissible as exceptions to the hearsay rule are dying declarations, statements against interest and, in limited instances, statements pertaining to family history, relationship and pedigree. *Id* at 57.

The statements made by A.S. in the CAC video and in her testimony at the hearing regarding events C.S. recounted to her, as well as the statements Ms. Patterson made at the hearing regarding events C.S. recounted to her, are inadmissible hearsay unless they are admissible as exceptions to the hearsay rule when the declarant is deceased. As the statements do not appear to be dying declarations, statements against interest, or statements pertaining to family history, they are not exempted from the hearsay rule.

15

However, after carefully reviewing the entire record herein and considering the record before us in its totality, we conclude that the father has failed to present to this Court how the error had any substantial bearing or effect on the outcome of the case. Much of A.S.'s testimony related to the neglect and abuse of C.S. that she witnessed first-hand. The record reflects a reasonable factual basis to support adjudication of A.S. as a Child in Need of Care as to her father, such that the error did not have any substantial effect on the outcome of this case. Therefore, this assignment of error also lacks merit.

The father's third assignment of error is that the trial court erred in permitting a non-expert to testify as to the causation of A.S.'s behavior. The father argues that Ms. Petty testified as to her assessment of A.S. based on her experience with counseling as a medical professional, but was not deemed an expert, and therefore the trial court should not have considered any of Ms. Petty's opinions about A.S.[3] However, we have been unable to locate the complained-of testimony in the record before us.

Louisiana Code of Evidence Article 701 provides that if the witness is not testifying as an expert, his or her testimony in the form of opinions or inferences is limited to those opinions or inferences that are rationally based on the perception of the witness, and helpful to a clear understanding of his testimony or the determination of fact in issue. Ms. Petty knew and observed A.S. personally over an extended period of time. Therefore, Ms. Petty's testimony regarding her opinion that A.S. appearing happier and relieved after she moved out of her father's home was permissible. This assignment of error also lacks merit.

The father's fourth assignment of error is that the trial court erred in permitting testimony regarding the 2015 CINC proceedings. In this regard, the father again raises the issue of the handcuffs, arguing that the handcuff allegations were being drawn from the 2015 CINC proceedings. Nevertheless, given the overwhelming evidence of cruelty, emotional abuse, and neglect presented to the trial court, the father has failed to present to this Court how the alleged error in admitting testimony regarding the 2015

---

[3] The father specifically contends that Ms. Petty should not have been permitted to testify that A.S. was compliant because she was afraid of punishment.

16

CINC proceedings had any substantial bearing or effect on the outcome of the case. This assignment of error also lacks merit.

Having thoroughly reviewed the record in its entirety, it is the finding of this Court that the evidence received by the trial court, independent of all of the testimony complained of by the father in his second, third and fourth assignments of error, provides a reasonable factual basis for the trial court's rulings. Even if this Court solely considers A.S.'s testimony as to what she witnessed herself and completely disregards those portions of A.S.'s testimony that repeat what C.S. said to her; even if this Court completely disregards Ms. Jenny Petty's testimony; and even if this Court completely disregards testimonial references to handcuffs relative to the 2015 adjudication of A.S. and C.S. as Children in Need of Care, the remaining evidence present in the record before us overwhelmingly supports the trial court's ruling.

For the above and foregoing reasons, the September 26, 2018 judgment of the trial court adjudicating A.S. as a Child in Need of Care as to the father is affirmed. Costs of this appeal are assessed to the father.

**AFFIRMED**.